MURDOCK, Justice
(concurring in the result).
The question addressed in Part I of the main opinion is whether a jury reasonably could understand Dr. Nathan Strahl’s testimony to mean that it was probable that Peggy Sue Ellis, the decedent, would commit suicide if released from the hospital when she was. I believe they could, especially when that testimony is considered as a whole. Nonetheless, as discussed at the end of this writing, I do not believe Dr. Strahl’s testimony addressed precisely the *1143 right question in relation to the issue of proximate causation, and I therefore concur in the result.
The main opinion focuses in particular on Dr. Strahl’s statement that, given Ellis’s condition at the time of her release, “[i]t was highly probable that she might do something to herself, yes.” The main opinion takes the position that this wording should be read literally and must be construed to mean that there is a high ;probability that there was a possibility that Ellis would do something to harm herself upon discharge. I understand that it is possible to take the word “might” in this sentence in a strict and literal sense to mean “possible.”[6] That this could be the only reasonable interpretation of this particular statement, however, assumes or imposes upon both Dr. Strahl and the jury a standard of precision in the oral use of the English language that I do not think is appropriate or, more importantly, required as a matter of law in this case. This is particularly true when one considers the entirety of Dr. Strahl’s testimony.
As both the jury and Dr. Strahl were well aware, Ellis had a 30-year history of psychiatric problems, with repeated hospitalizations, more than one hospitalization in the past year, and two suicide attempts within the past year. Against this factual backdrop, the context of the above-quoted statement by Dr. Strahl includes the immediately preceding questions and answers, namely:
“Q[uestion:] ... In your opinion, given your review of the records and your understanding of Ms. Ellis’s condition on 11/23/99, was there a probability that she tuould attempt suicide or self-harm, if she was released from the hospital?
[[Image here]]
“A[nswer:] That was a probability.”
(Emphasis added.) Dr. Strahl then added to this answer the following additional statement, and a follow-up question was posed:
“The probability increases the more factors that she would carry leaving the hospital that are risk factors for suicide. “[Question:] And did Ms. Ellis possess many of these risk factors?
“A[nswer:] She did.”
(Emphasis added.) Only as a follow-up to these questions and answers do the following question and answer appear in the transcript:
“Q[uestion:] Was it highly probable?
“A[nswer:] It was highly probable that she might do something to herself, yes.”
(Emphasis added.) Taken as a whole, and in context, Dr. Strahl’s testimony reasonably could be construed by jurors to be testimony by Dr. Strahl that it was probable that Ellis would attempt to harm herself upon her discharge from the hospital on the date in question. That context is supplemented by the subsequent testimony of Dr. Strahl that “suicide was an imminent potential given Ms. Ellis’s release on November 23, 1999.” Indeed, in my opinion, the interpretation urged by the appellant, the administrator of Ellis’s estate, is more reasonable than that urged by Dr. Patton and the Clinic.
In addition, the construction urged by Dr. Patton and the Clinic essentially deprives Dr. Strahl’s statement of any meaning at all. Anything is “possible”; thus, there always is a high probability — if not a certainty — that it is “possible” that anyone discharged from the hospital could at any time thereafter commit suicide. Given the context within which Dr. Strahl gave his testimony, and considering that testimony *1144 as a whole, I declíne the invitation to conclude that it was Dr. Strahl’s intent, or that the jury must conclude that it was his intent, to give expert opinion testimony bereft of any probative value.
The testimony in Giada v. Tucker, 746 So.2d 998 (Ala.1999), was sufficiently similar to that in the present case to make the Giada Court’s analysis instructive:
“In the present case, Ms. Giada presented the trial court with an affidavit from Dr. Scott A. Kale, a physician board-certified in internal medicine, with a specialty in rheumatology. Dr. Kale testified, by way of affidavit, that had Dr. Tucker correctly diagnosed and treated Ms. Giada’s condition, ‘it is most likely probable that blindness would not have occurred.’ It is clearly difficult to distinguish between the meaning of the phrase ‘most likely probable’ and the meaning of the word ‘probable.’ [7] Dr. Kale’s words could mean that there is only a chance that it is probable that had treatment begun earlier blindness would not have occurred; if this is the case, the trial court would have been correct in entering the summary judgment. However, the statement could also have been Dr. Kale’s way of restating what he had said earlier. The insertion of a comma would have dramatically changed the statement to ‘most likely, probable.’ The doctor could have meant to say that the delay in administering steroid therapy most likely caused Ms. Giada’s blindness, i.e., that it was probable that Dr. Tucker’s negligence caused Ms. Giada’s blindness. Or Dr. Kale may have intended to strengthen the meaning of the word ‘probable,’ as in ‘very probable.’
“In reviewing a summary judgment, this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990). Ambiguities must be resolved, in favor of the nonmovant. See Ex parte Brislin, 719 So.2d 185 (Ala.1998); Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996); Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991). Resolving the ambiguity in Dr. Kale’s statement in favor of Ms. Giada, we conclude that the phrase ‘most likely probable’ is indistinguishable from the single word ‘probable.’ Therefore, we conclude that Ms. Giada presented substantial evidence that Dr. Tucker’s negligence probably caused her injury. Dr. *1145 Kale’s affidavit created a jury question as to proximate cause in this case.”
Giada, 746 So.2d at 1000-01 (emphasis added).
That said, I nonetheless concur in the result reached by the main opinion. I do so because, regardless of which view is taken of Dr. StrahPs testimony, that testimony did not address the precise question that it had to address in order to establish proximate causation.
The question that had to be addressed in order to establish whether Dr. Patton’s discharge of Ellis caused Ellis’s death was not whether suicide was probable following any discharge of Ellis from the hospital on November 23, 1999, but, instead, whether suicide was probable given the particular discharge that was implemented by Dr. Patton on that date. The discharge implemented by Dr. Patton was not a “naked” discharge, but was one accompanied by three specific safeguards, including the prescription of strong medication and the engagement of two other parties to hold Ellis accountable for filling the prescription for and thereafter taking that medication. There was no testimony, however, by Dr. Strahl or any other expert witness that it was probable that Ellis would commit suicide upon being discharged under these arrangements. Nor was there any testimony by any witness that Ellis probably would not fill the prescription or take the medicine, or that both of the other parties engaged to hold Ellis accountable in these respects would not fulfill their commitments. The failure of each of these three safeguards, cumulatively if not separately, arguably constitute independent intervening efficient causes. Without testimony that it was probable that these safeguards would fail, and in particular that Dr. Patton knew or should have known that it was probable that these safeguards would fail, I do not see substantial evidence in the record that Ellis’s discharge on November 23, 1999, with these safeguards in place, was the proximate cause of Ellis’s suicide.

. In the first sentence of note 2, the main opinion paraphrases a portion of this statement, and, in the process, rewords it in a way that oversimplifies it and changes its import.

. Note 2 of the main opinion suggests that Giada is distinguishable from the present case because the testimony in Giada used the term “would” rather than the term "might,” as does the present case. 6 So.3d at 1136. In asserting this as a distinction, the main opinion misperceives the apposite comparison between the language in Giada and the language in the present case. The parallelism that makes Giada instructive does not involve the term “would.” Rather, the apposite comparison is between the Giada expert's use of the two equivocal terms, "most likely” and "probable,” and the use in the present case of the two equivocal terms, "highly probable” and "might.” The Giada Court held, in the context of written testimony, that the expert’s use of the phrase "most likely probable” did not necessarily have a different meaning in common parlance than if the expert had simply used the term “probable” by itself. My point is that it is similarly difficult to say, in the context of the oral testimony at issue here, that the expert's use of the phrase "highly probable that [Ellis] might” necessarily has a different meaning in common parlance than if the expert had simply used the phrase "highly probable.” I do not believe we can say as a matter of Law that there is such a difference, particularly when this is considered in conjunction with the balance of Dr. Strahl's testimony and the Giada Court's admonitions that we must review such testimony "in a light most favorable to the nonmovant and must resolve all reasonable doubts against the mov-ant.” 746 So.2d at 1000.